**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re ) | | |
| ) | | |
| ARROW SPEED WAREHOUSE, INC., et al., ) | Case No. 08-50698 | |
| ) | | |
| Debtors. ) | | |
| ) | | |
| ) | | |
| ARROW SPEED WAREHOUSE, INC., ) | | |
| ) | | |
| Plaintiff, ) | | |
| v. ) | Adversary Case No. 09-4030 | |
| ) | | |
| O'REILLY AUTOMOTIVE, INC., ) | | |
| ) | | |
| Defendant. ) | | |

## **MEMORANDUM OPINION**

In this adversary proceeding, the Debtor, Arrow Speed Warehouse, Inc. ("ASW"), seeks to collect from Defendant O'Reilly Automotive ("O'Reilly") $720,758.00 for goods O'Reilly purchased from ASW, finance charges on the balance due, and the costs ASW has incurred in the collection of these amounts. O'Reilly does not deny that it owes ASW $720,758.00, but it does dispute that ASW is entitled to finance charges and the costs of collection. Moreover, O'Reilly has asserted counterclaims against ASW in excess of the amount ASW seeks from O'Reilly. Specifically, O'Reilly argues that ASW has breached ASW's (alleged) obligation to accept the return of certain goods and that ASW has breached express and implied warranties.

ASW now moves for summary judgment on its complaint and on all of O'Reilly's counterclaims. For the reasons stated below, the Court finds that ASW is entitled to summary judgment on its claims for $720,758.00 and the costs of collection, but not on its claim for finance charges. ASW is also entitled to summary judgment on Count I of O'Reilly's counterclaim. On Counts II and III, ASW is entitled to partial summary judgment only.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings, discovery, and disclosure material on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[1] The summary judgment procedure is an integral part of the Federal Rules, not a disfavored procedural shortcut.[2] In a motion for summary judgment, the moving party has the initial burden of demonstrating the absence of genuine issues of material fact by reference to pleadings, depositions, answers to interrogatories, admissions, and affidavits.[3] Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial, and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion.[4] "A 'genuine issue' in the context of a motion for summary judgment is not simply a 'metaphysical doubt as to the material facts.' "[5] Rather, "a genuine issue exists when the evidence is such that a reasonable fact finder could find for the non-movant."[6] When reviewing the record for summary judgment, the court is required to draw all reasonable inferences in favor of the non-movant; however, the court is "not required to draw every conceivable inference from the record – only those inferences that are reasonable."[7]

**STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

1. ASW sold auto parts to O'Reilly from 1981 until ASW ceased doing business in November 2008.

2. On or about March 13, 1981, O'Reilly submitted a "Credit Application and Agreement" to ASW. The final paragraph of the Credit Application and Agreement states: "In the event it becomes necessary for your company (ASW) to incur collection costs or institute suit to

---

[1] Fed. R. Bankr. P. 7056.

[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

[3] *Id.*, 477 U.S. at 323.

[4] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[5] *Id.*

[6] *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994).

[7] *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

collect any amount due under this agreement or any portion thereof, the undersigned promises to pay such additional collection costs, charges and expenses including reasonable attorney's fees incurred by your company (ASW)."

3. O'Reilly and ASW also entered into a series of "Vendor Agreements" prepared by O'Reilly, the last of which was dated June 19, 2007. The vendor agreement form was created by O'Reilly for use with all of its vendors.

4. Sections of Vendor Agreement germane to this matter include:

   a. On page 3, under the heading "Payment Terms," there are spaces for several terms, such as "___% Cash Discount," but the only term provided states, "O'Reilly Purchase Order terms should read as follows: Net 25th."

   b. On pages 10-11, under the heading "Returns/Recalls/Cores," there are several check boxes next to various terms, such as "Annual Stock Adjustment" and "All returns will be credited at current invoice prices." Only the box next to the phrase "Open to Return Privilege (no R.G.A. [Return Goods Authorization] required)" is checked. However, specific instructions and contact information are provided for obtaining an RGA.

5. ASW sent monthly statements to O'Reilly. These statements contain a conspicuous notice (segregated by a black box) stating , "Please note that your pricing and discounts are based on your ability to provide full payment by the 10th of the month. We reserve the right to charge back 5% of any delinquent balance."

6. O'Reilly has never paid a delinquency charge or interest to ASW.

7. O'Reilly never agreed to pay a delinquency charge of 5% on past due invoices or interest at the rate of 1.5% per month.[8]

8. Throughout their 27-year business relationship, ASW had guaranteed it would take back merchandise.[9] In the auto parts industry, this arrangement is called a "guaranteed sale."

9. O'Reilly returned merchandise for several reasons, including eliminating merchandise that was not selling, reducing overstocks of merchandise, and warranty returns.

10. The established procedure for returning merchandise to ASW was for O'Reily to request a Return Goods Authorization (RGA), ASW would give O'Reilly the RGA, O'Reilly would return the goods, and ASW would give O'Reilly credit for the returned merchandise. O'Reilly could also return products by getting authorization on line and sending it back.

---

[8] ASW objected to this statement on the grounds that it was a legal conclusion. The Court, however, interprets it as a factual statement indicating O'Reilly's intent.

[9] The Court interprets this statement as an indication of the parties' course of performance, not a legal conclusion (as ASW contends).

11. The history and practice between O'Reilly and ASW were that anytime O'Reilly wanted to return merchandise, ASW would issue an RGA and accept the return, except for damaged goods.

12. ASW never rejected a whole return.

13. During the business relationship with ASW, O'Reilly performed an annual product line review in October of each year.

14. Based on O'Reilly's agreement with ASW, and all the years of dealing with them, if something wasn't performing, ASW always took it back every year even if it was ten years down the road.[10]

15. Until ASW filed bankruptcy, O'Reilly was returning merchandise to ASW in the normal course of business.

16. Tom Seboldt ("Seboldt") has been the Vice President of Merchandise at O'Reilly since 2007. Prior to that, he was a product manager for O'Reilly and worked with the ASW account from 1996 until about 2000.

17. Since Seboldt became Vice President of Merchandise at O'Reilly, his main contacts at ASW have been Rob Eberhart and Jeff Coppaken.

18. Seboldt is the supervisor of two product managers at O'Reilly: Joe Winterberg ("Winterberg") and Scott Cannon ("Cannon").

19. Winterberg bought all the performance accessories and Cannon bought all the truck accessories.

20. Seboldt acted as a conduit for O'Reilly's vendors and got involved in financial decisions if the O'Reilly finance department had a dispute they could not settle or if the situation could harm O'Reilly. Seboldt has been involved with decisions regarding payments sought by ASW over the past three years.

21. "The biggest problem O'Reilly had with ASW occurred in the summer of 2008."[11]

22. O'Reilly's product mangers informed Seboldt that they had heard from other companies in the industry that ASW was having problems.

23. As a result, Seboldt took the initiative and called ASW to inquire about its situation.

24. Cannon, Winterberg, and sometimes Seboldt began having regular telephone conferences with ASW – mainly with the president of ASW, Ron Coppaken – in the summer of 2008. The topic of returning guaranteed merchandise was discussed during some of these phone calls.

---

[10] The Court interprets the reference to "agreement" here to refer to the parties' course of performance.

[11] This factual statement, taken verbatim from O'Reilly's response to ASW's motion for summary judgment, is noteworthy for its characterization of the parties' relationship.

25. Ron Coppaken told Seboldt, Winterberg, and Cannon about ASW's financial situation during this time. The finances at ASW were a matter of concern at O'Reilly because ASW was a major supplier and O'Reilly was constantly returning products to ASW.

26. Seboldt believed that ASW was going to file bankruptcy, so he took stock of what O'Reilly had and what he felt O'Reilly was owed by ASW. Seboldt obtained that information from the product managers and instructed the finance department to ensure that O'Reilly had enough payments to cover that liability.

27. On September 21, 2008, ASW filed a bankruptcy petition.

28. After ASW filed bankruptcy, O'Reilly and ASW continued to do business on the same terms as before until about November 10, 2008.

29. O'Reilly continued to pay for product after the bankruptcy was filed.

30. O'Reilly continued to make returns in the normal course of business.

31. O'Reilly has continued to honor warranties to its customers on merchandise it purchased from ASW.

32. In October and November 2008, Sebolt and Cannon informed Ron Coppaken by telephone that O'Reilly had inventory in excess of $1.1 million that O'Reilly wanted to return to settle its account. Ron Coppaken refused to take back the "ASW Purchased Inventory Requested for Return."[12]

33. After ASW filed bankruptcy, O'Reilly did not try to return any of the Inventory Requested for Return because of the bankruptcy filing and ASW's refund [refusal] to take it back.[13]

34. O'Reilly was not willing to take the risk of returning the Inventory Requested for Return without the guarantee of getting either a credit or a check because of the bankruptcy filing.

35. On February 17, 2009, Scott Cannon calculated and determined that O'Reilly had $1,179,439.06 worth of underperforming merchandise on hand that O'Reilly wanted to return to ASW. This is the merchandise O'Reilly refers to as the Inventory Requested for Return.

36. The Inventory Requested for Return consists mostly of truck accessories that were going to be returned to ASW as part of the October 2008 annual product line review. All of the truck accessories included in the Inventory Requested for Return were performing below the

---

[12] It is unclear from O'Reilly's statement of undisputed facts when Ron Coppaken refused to take back the inventory O'Reilly wanted to return. O'Reilly recited this fact in connection with facts surrounding conversations Seboldt and Cannon had with Coppaken in October and November. However, the term defined by O'Reilly as "ASW Purchased Inventory Requested For Return" ("Inventory Requested For Return") refers to a list of inventory Cannon compiled in February 17, 2009, several months after these conversations allegedly occurred.

[13] This statement, taken from O'Reilly's statement of uncontroverted fact appears to contain a typographic error, referring to a "refund" instead of "refusal." Also, O'Reilly refers here again to "ASW Purchased Inventory Requested" in relation to a time period that apparently preceded O'Reilly's compilation of that list.

criteria set by O'Reilly for each of those product lines.

37. The Inventory Requested for Return included product that was on hand at O'Reilly on or before the petition date, including Window Canvas products in the amount of approximately $244,000.00, Pop-N-Lock product in the amount of approximately $47,000.00, Bores products in the amount of approximately $126,000.00, All Sales products in the amount of approximately $266,000.00, Putco products in the amount of approximately $258,000.00 and Bullet products in the amount of approximately $247,000.00.

38. The total value of the Inventory Requested for Return on hand as of the petition date was approximately $1,188,000.00.

39. Despite attempts to sell the Inventory Requested for Return, O'Reilly has not been able to sell $1,064,212.26 worth of the Inventory Requested for Return.

40. O'Reilly still has approximately a year's worth of products purchased from ASW that could come back to O'Reilly under warranty.

41. On February 17, 2009, Scott Cannon calculated O'Reilly's warranty exposure to be $419,550.00 based on the amount of product purchased from ASW within the prior 12 months and O'Reilly's actual historical averages of payment of warranty claims at approximately 5% per year.

42. Since September 21, 2008, O'Reilly has taken back $15,868.18 on warranty claims associated with ASW products.

43. O'Reilly has not paid for $720,758.00 worth of goods ASW sold to O'Reilly in 2008.

44. These goods were sold to O'Reilly pursuant to the Vendor Agreement, and all of the billing statements related to the sale of these goods contained a notice stating: "Please note that your pricing and discounts are based on your ability to provide full payment by the 10th of the month. We reserve the right to charge back 5% of any delinquent balance."

45. ASW has charged back $36,037.90, or 5 percent of the delinquent amount, against O'Reilly.

46. Of the $720,758.00 that ASW claims O'Reilly owes it, the sum of $256,815.24 is for invoices that were issued by ASW prior to the petition date.

47. As of June 9, 2009, ASW had incurred attorneys' fees as a result of this lawsuit in the amount of $25,866.84 and costs in the amount of $752.24.

**DISCUSSION**

As noted above, ASW seeks summary judgment on all of the claims asserted in its complaint and on all counts of O'Reilly's counterclaim. The complaint has essentially three components: a demand for $720,758.00 O'Reilly allegedly owes ASW for unpaid purchases of goods; a demand for a finance charge of 1.5% per month on past due amounts; and a demand for the costs ($752.24) and attorneys' fees ($25,866.84) ASW has incurred in its collection efforts. O'Reilly's counterclaim also has three counts: Count I alleges that ASW breached its (alleged) obligation to accept the return of $1,179,439.06 of goods purchased from ASW; Count II seeks damages of $419,550.00 for ASW's alleged breach of express warranties; and Count III seeks $419,550.00 in damages for ASW's alleged breach of the implied warranties of merchantability and fitness for a particular purpose. The Court addresses each of these issues in order.

**A.    ASW's Complaint**

  **1.    ASW is entitled to summary judgment on its claim for the amount due on account.**

O'Reilly does not dispute ASW's contention that ASW provided O'Reilly with $720,758.00 of goods for which O'Reilly has not paid. And the Court finds that the undisputed facts do, indeed, support this contention. The portion of the debt owed to ASW by O'Reilly on the date of bankruptcy ($256,815.24) constitutes property of the bankruptcy estate under 11 U.S.C. § 541(a)(1), and the portion owed to ASW attributable to post-petition invoices is property of the bankruptcy estate under § 541(a)(6) and (7). Therefore, ASW is entitled to summary judgment on its claim for turnover of $720,758.00.

  **2.    ASW is <u>not</u> entitled to summary judgment on its claim for finance charges.**

In its complaint, ASW makes a demand for a 1.5% per month finance charge on past due amounts. ASW's motion for summary judgment, however, makes no mention of a 1.5% per month finance charge. Instead, the motion adopts a new basis for recovery, stating that ASW is entitled to a 5% "charge-back" on past-due amounts. ASW has offered no explanation for this discrepancy, nor has it amended its complaint to make a demand for a 5% charge-back on past-due amounts. The uncontested facts ASW recites in its motion do not support summary judgment on its claim for a

1.5% finance charge. And the facts recited offer some (but not sufficient)[14] support for its claim for a 5% charge-back in that the monthly statement offered as an example of the statements sent to O'Reilly does contain a notice that ASW reserves the right to charge back 5% of any delinquent balance, but nowhere on that statement is there any mention of a 1.5% per month finance charge. The Court cannot and will not grant ASW summary judgment on a claim it did not plead in its complaint. Therefore, ASW is not entitled to summary judgment on its claim for a 1.5% per month finance charge or a 5% charge-back on the amount due.

### 3.  ASW is entitled to summary judgment on its claim for the costs of collection.

ASW bases its claim for collection costs on the provision in the Credit Application and Agreement executed by the then (and current?) president of O'Reilly, Charlie O'Reilly, which states: "In the event it becomes necessary for your company (ASW) to incur collection costs or institute suit to collect any amount due under this agreement or any portion thereof, the undersigned promises to pay such additional collection costs, charges and expenses including reasonable attorney's fees incurred by your company (ASW)." O'Reilly argues that ASW is not entitled to recover those costs because the Vendor Agreement constitutes a novation of the Credit Application and Agreement, superceding and supplanting its terms, and the Vendor Agreement does not contain a provision granting ASW the right to recover collection costs. O'Reilly's argument fails for two reasons.

First, the defense of "novation" is an affirmative defense which must be specifically pled or it is deemed waived.[15] O'Reilly did not plead novation in its Answer, so it is deemed to have waived that argument and cannot raise it in defense to ASW's motion for summary judgment. Second, even if the Court were to permit O'Reilly to raise this issue of novation at this juncture, O'Reilly has

---

[14] The Credit Agreement and Vendor Agreement do not provide for a finance charge – 1.5 % per month or a 5% charge-back. The entire basis for ASW's claim to a finance charge rests on language ASW included on its invoice, ostensibly authorizing ASW to charge O'Reilly 5% on overdue amounts. In the absence of evidence that O'Reilly explicitly agreed to a finance charge or, at the least, evidence that the addition of such a term to the parties' contract does not constitute a "material alteration" of the contract within the range of trade practice – *see* Mo. Rev. Stat. § 400.2-207, Comment 5 – ASW cannot prevail on its claim for a finance charge.

[15] *See Charles Kahn & Co. v. Sobery*, 355 F.Supp. 156 (E.D. Mo. 1972) (novation is an affirmative defense under Fed R. Civ. P. 8(c)); *W. Crawford Smith, Inc. v. Watkins*, 425 S.W.2d 276, 279 (Mo. Ct. App. 1968).

failed to prove that a novation occurred.

The novation of a contract – *i.e.*, extinguishing a prior agreement by the execution of a subsequent agreement – cannot be presumed from the mere fact that a second contract was entered into.[16] A novation requires the agreement of the parties to the original contract,[17] and a party seeking to prove that a novation occurred must do so by clear and convincing evidence. O'Reilly has not offered any testimonial or evidentiary support that a novation occurred. Rather, O'Reilly *presumes* that the Vendor Agreement replaced any prior agreement the parties might have had because it constitutes a "comprehensive restatement of the relationship between the parties."[18] The Vendor Agreement is comprehensive, but it does not contain an "entire agreement," "integration," or "merger" clause, nor are its terms inconsistent with the terms of the Credit Application and Agreement.

Therefore, the Court finds that O'Reilly is obligated to pay ASW the costs of collecting overdue amounts under the terms of the Credit Application and Agreement. ASW has submitted uncontroverted evidence that these costs total $26,619.08 ($25,866.84 in attorneys' fees plus $752.24 in expenses).

**B      O'Reilly's Counterclaim**

**1.      ASW is entitled to summary judgment on Count I of O'Reilly's Counterclaim.**

Count I of O'Reilly's counterclaim alleges that ASW owes O'Reilly $1,179,439.06 in damages resulting from ASW's breach of an alleged obligation to accept the return of certain goods sold to O'Reilly. ASW is entitled to summary judgment on Count I for several reasons, each one singularly fatal to O'Reilly's position.

The first two reasons relate to infirmities in O'Reilly's pleadings. First, O'Reilly has failed to allege a single undisputed (or disputed, for that mater) fact supporting Count I as originally pled. In its Answer and Counterclaim, which has not been amended, O'Reilly alleges that ASW breached the Vendor Agreement by refusing to accept "goods shipped that do not appear on Defendant's

---

[16] *General Ins. Co. of America v. Klein*, 517 S.W.2d 726, 730 (Mo. Ct. App. 1974).

[17] *McHenry v. Claspill*, 545 S.W.2d 690, 692-93 (Mo. Ct. App. 1976).

[18] Defendant's Response, p. 28.

purchase orders, quantities that are shipped in excess of the purchase order amounts or merchandise shipped that is not currently carried by Defendant in its distribution facilities."[19] In its response to ASW's motion for summary judgment, however, O'Reilly does not cite one instance, let alone $1,179,439.06 worth of instances, where ASW shipped goods that did not appear on O'Reilly's purchase orders, were in excess of the purchase order amounts, or were not carried by O'Reilly in its distribution facilities. Instead, O'Reilly now alleges that the Vendor Agreement, *as amended by the parties' course of performance*, required ASW to accept the return of any good O'Reilly determined in its own discretion was "underperforming." O'Reilly cannot prevail on a claim based on an entirely different factual and legal theory not pled in its original and unamended counterclaim.

Second, O'Reilly cannot proceed with its newly adopted theory that ASW's obligation to accept the returns at issue arises from the parties' "course of performance," because the assertion of "course of performance" to establish or defend against a breach of contract claim is in the nature of an affirmative defense,[20] which is waived if not timely asserted. O'Reilly's assertion of "course of performance" as a defense to ASW's claim and as a basis for recovery against ASW (inasmuch as O'Reilly's breach of contract claim exceeds ASW's claim) in O'Reilly's response to the motion for summary judgment is not timely. Therefore, O'Reilly is deemed to have waived this argument.

Finally, ASW is entitled to summary judgment on Count I of O'Reilly's counterclaim because the undisputed facts establish that while there was indeed a course of performance between the parties wherein ASW regularly accepted returns of goods that O'Reilly had determined were underperforming,[21] that course of performance had certain parameters, and O'Reilly's conduct with regard to, and the substance of, the returns at issue fell far outside those parameters.

---

[19] Defendant's Answer, ¶ 25-26.

[20] *See e.g., S.P. Richards Co. v. Business Supply Corp.*, 2008 WL 4181729 (N.D. Ill. 2008) (noting that "course of performance" is an affirmative defense); *First Union Nat'l Bank v. Pictet Overseas Trust Corp.*, Ltd., 477 F.3d 616, 622 (8th Cir.2007) ("Generally, failure to plead an affirmative defense results in a waiver of that defense.") (citations omitted).

[21] ASW's objection to O'Reilly's "course of performance" argument focuses largely on the alleged legal barriers to modifying the explicit terms of a contract by a course of performance. Because the Court finds that O'Reilly's argument is without factual support, the Court does not to rule on its legal propriety, although Mo. Rev. Stat. §§ 400.2-202, 400.2-208, and 400.2-209 might support O'Reilly's course of performance theory under the right set of facts.

First, O'Reilly did not follow the accepted procedure for making returns. "The history and practice between O'Reilly and ASW was [sic] such that *anytime* O'Reilly wanted to return merchandise, ASW would issue an RGA and accept the return, except for damaged goods."[22] "Pursuant to the agreed procedure, O'Reilly would request a returned goods authorization ("RGA") from Arrow Speed, Arrow Speed would provide the RGA, O'Reilly would return the goods and receive a credit."[23] O'Reilly admits that it never requested an RGA for the Inventory Requested for Return.

Second, there was no precedent for the scale of the return O'Reilly argues ASW wrongfully refused. O'Reilly contends (although somewhat obliquely) that in addition to routine returns, it returned a large number of underperforming goods as a part of its "annual product line review" in October each year. Nothing in the undisputed facts, however, supports an interpretation that the parties' course of performance permitted a return of over $1.1 million in goods at one time. And O'Reilly's admission that the proposed return of the Inventory Requested for Return was intended to "settle its account," by its own terms, places the proposed return outside the parties' course of performance.

Third, the timing of O'Reilly's proposed return was also inconsistent with O'Reilly's contention that the Inventory Requested for Return was part of the parties' course of performance because O'Reilly first considered returning all of its underperforming goods to ASW in the summer of 2008, and the list of Inventory Requested for Return was not compiled until February 2009. Either way, the timing does not coincide with the annual product line review O'Reilly states usually took place in October.

In sum, O'Reilly cannot maintain a claim against ASW for its failure to accept returns pursuant to the parties' course of performance where the undisputed facts establish that O'Reilly did not make or attempt to make any return consistent with the parties' course of performance. Therefore, ASW is entitled to summary judgment on Count I of O'Reilly's counterclaim.

---

[22] Defendant's Response, ¶ 59 (emphasis added).

[23] Plaintiff's Suggestions, ¶ 11.

### 2. ASW is entitled to partial summary judgment on Counts II & III of O'Reilly's Counterclaim.

Counts II and III of O'Reilly's counterclaim each seeks $419,550 in damages for ASW's alleged breach of express and implied warranties (respectively).[24] Of this figure, the undisputed facts suggest that O'Reilly has suffered actual damages of only $15,868.18. The rest of the damages are, O'Reilly admits, an estimation of O'Reilly's potential liability. Under Missouri law, to prevail on a claim for a breach of warranty – express or implied – a plaintiff must prove actual, not speculative, damages.[25] Therefore, ASW is entitled to judgment as a matter of law with regard to the speculative amount of O'Reilly's claim ($403,681.82). ASW is not entitled to summary judgment, however, on the portion of O'Reilly's claim for damages O'Reilly maintains actually incurred ($15,868.18). O'Reilly has alleged undisputed facts sufficient to raise material issues of fact whether ASW breached express or implied warranties, and whether O'Reilly did in fact suffer damages of $15,868.18 as a result of ASW's alleged breach of those warranties.

### CONCLUSION

For the reasons stated above, ASW is entitled to summary judgment against O'Reilly for $747,377.08, representing the cost of goods O'Reilly purchased but did not pay for ($720,758.00) plus the costs ASW has incurred in collecting this amount ($25,866.84 in attorneys' fees and $752.24 in expenses). ASW is also entitled to summary judgment on Count I and partial summary

---

[24] Based on the total damages sought in the counterclaim, these Counts are not cumulative; they are simply alternate theories for the same damages.

[25] To prevail on a claim for the breach of an express warranty, a plaintiff must prove that: 1) the defendant sold the goods to the plaintiff; 2) the defendant represented to the plaintiff that the goods were of a certain kind or quality; 3) the plaintiff's representation induced the defendant's purchase of, or was a material factor in the defendant's decision to purchase, the goods; 4) the goods did not conform to the representations made; 5) the defendant notified the plaintiff of the non-conformity within a reasonable time; and 6) the defendant was damaged. *Carpenter v. Chrysler Corp.*, 853 S.W.2d 346, 357 (Mo. Ct. App. 1993). To prevail on a clam for the breach of an implied warranty of fitness for a particular purpose, a plaintiff must prove that: (1) the defendant sold the product; (2) the defendant knew or should have known of the use for which the product was purchased; (3) the plaintiff reasonably relied upon the defendant's judgment that the product was fit for such a use; (4) when sold by the defendant, the product was not fit for such a use; (5) within a reasonable time after the plaintiff knew or should have known the product was not fit for such use, the plaintiff gave the defendant notice thereof; and (6) as a direct result of the product being unfit for such use, the plaintiff was damaged. *Doe v. Miles, Inc.*, 2000 WL 667383 (Mo. Ct. App. 2000). *See also Koeller ex rel. Koeller v. Unival, Inc.*, 906 S.W.2d 744, 746 (Mo. Ct. App. 1995) (claim for indemnification (such as O'Reilly's claim against ASW) is not ripe until indemnitee incurs an actual liability).

judgment on Counts II and III of O'Reilly's counterclaim. Therefore, the only issue remaining for trial is whether O'Reilly's is entitled to $15,868.18 for ASW's alleged breach of express and implied warranties. A separate Order will be entered in accordance with Bankruptcy Rule 9021.

**ENTERED** this 24th day of September 2009.

/s/ Jerry W. Venters
HONORABLE JERRY W. VENTERS
UNITED STATES BANKRUPTCY JUDGE

Copies to:
Lisa A. Epps
Dan Nelson